1

2

3

4              **UNITED STATES DISTRICT COURT**

5             **NORTHERN DISTRICT OF CALIFORNIA**

6                  **SAN JOSE DIVISION**

7

8     MONIA WILLIAMS, individually and as        Case No.  19-cv-01811-BLF
      Guardian ad Litem for L.S. and Q.S,
9     minors,
                                                 **ORDER GRANTING IN PART AND**
10              Plaintiffs,                       **DENYING IN PART DEFENDANTS'**
                                                 **MOTIONS FOR SUMMARY JUDGMENT**
11          v.
                                                 [Re:  ECF 115, 116]
12    COUNTY OF MONTEREY, et al.,

13              Defendants.

14

15          Monia Williams filed this suit on behalf of herself and her minor children, daughter L.S.

16   and son Q.S., following removal of the children from her custody.  The children were out of

17   Williams' custody for three months, at which time the juvenile dependency proceedings arising

18   from the removal were dismissed.  Plaintiffs assert claims under federal and state law against the

19   County of Monterey, the City of Salinas, and individual County social workers and City police

20   officers who were involved in the removal.

21          Before the Court are two motions for summary judgment.  One motion is brought by the

22   County of Monterey and its social worker employees Linda Castillo, Justin Ricks, Charlene Lord,

23   Christine Lerable, Chelsea Chacon, and Rebecca Barron.  The other motion is brought by the City

24   of Salinas and its law enforcement officers Guadalupe Gonzalez, Blake Ziebell, and Dana

25   Cornelison.  In response to the motions, Plaintiffs concede certain claims and argue that disputed

26   facts preclude summary judgment on other claims.

27          Both motions for summary judgment are GRANTED IN PART AND DENIED IN PART

28   for the reasons discussed below.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.      FACTUAL BACKGROUND

*County Social Worker Castillo Investigates Possible Sexual Abuse of L.S.*

On Friday, May 4, 2018, County of Monterey social worker Linda Castillo was dispatched to the elementary school attended by eight-year-old twins L.S. and Q.S. in response to a teacher's report of potential sexual abuse of L.S.  *See* Castillo Decl. ¶ 5, ECF 115-8.  The referral included the information that L.S.'s brother, Q.S., had told a teacher that he gets "sad" when the children's uncle takes L.S. to another room for "secret special time."  *Id.*

Castillo interviewed Q.S., who told her that when the children's Uncle Pat comes to the house, he takes L.S. upstairs with him but tells Q.S. to stay downstairs.  *See* Castillo Decl. ¶¶ 6-8. Q.S. stated that Uncle Pat told L.S. about licking, and that Uncle Pat is nice to L.S. but mean to him.  *See id.*  Q.S. stated that he told his mother (Williams) about Uncle Pat doing licks with L.S., but Williams responded by asking why Uncle Pat would do such a thing and telling Q.S. that he could not tell anyone about it.  *See id.* ¶ 9.  When Castillo asked what exactly he was not supposed to tell about, Q.S. wrote a word on a piece of paper that Castillo read as "sexes."  *See id.*

Castillo next interviewed L.S., who initially said she had not been touched in a way that made her uncomfortable, but subsequently indicated that she had been touched on the foot, back, buttocks, vaginal area, and face by circling those areas on a picture of a girl.  *See* Castillo Decl. ¶ 11.  L.S. also circled the buttocks, hand, and penis on a picture of a boy, indicating that she'd seen those body parts on "Pat."  *See id.*  L.S. said that Pat had put "this," pointing to the penis on the boy picture, "here," pointing to the vagina on the girl picture.  *See id.*  She also pointed to the penis on the boy picture and said "lollipop."  *See id.*  Castillo asked L.S. about the game "licks," and L.S. said Pat wanted her to lick the lollipop but she did not do it.  *See id.* ¶ 12.  L.S. then said that she did it only one time.  *See id.*

Castillo could not determine whether Q.S. and L.S. understood the difference between truth and lie, and thus she could not qualify them for courtroom testimony.  *See* Castillo Decl. ¶¶ 7, 10, 14.  However, Castillo believed the children and believed sexual abuse had occurred.  *See id.* ¶ 14.  She contacted law enforcement and asked that an officer come to the school.  *Id.* ¶ 15.

United States District Court
Northern District of California

1

*City of Salinas Law Enforcement Arrives at the School and Investigates*

Two City of Salinas police officers arrived at the school shortly before 5:00 p.m., Field Training Officer Guadalupe Gonzalez (also referred to as Guadalupe Rodriguez) and Trainee Officer Blake Ziebell.  *See* Gonzalez Decl. ¶ 4 & Exh. 1 (Police Report), ECF 116-1.  The officers spoke with Castillo, who gave them a summary of her interviews with Q.S. and L.S.  *See* Gonzalez Decl. ¶ 6 & Exh. 1 (Police Report).  Gonzalez and Ziebell then interviewed several individuals.  *See* Gonzalez Decl. ¶ 8; Pls.' Joint Exhibits, ECF 124.

Q.S. told the officers that he thought Uncle Pat and his sister were having sex, but then he said they weren't having sex.  *See* Pls.' Joint Exhibits, Exh. C1 at 13 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Q.S.).  Q.S. described walking into a bedroom and seeing his sister on the bed while Uncle Pat kneeled next to the bed, both dressed.  *See id.* at 14.

L.S. told the officers that Uncle Pat used to come over weekly but did not come over anymore.  *See* Pls.' Joint Exhibits, Exh. D1 at 4 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with L.S.).  She said that Uncle Pat touched her chest, feet, belly, and private parts.  *See id.* at 6-7.  She also said Uncle Pat liked to play the game Lolly, or lollipop, and that his penis was called a lollipop.  *See id.* 8-9.  L.S. reported that Uncle Pat asked her to touch his lollipop but she said no.  *See id.* at 13.  L.S. said Uncle Pat had not come over for five weeks.  *See id.* at 11-12.

Officer Ziebell next spoke to Williams, who had arrived at the school to pick up her children.  *See* Pls.' Joint Exhibits, Exh. E1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Williams).  Williams stated that LaPatrick Carroll is her brother, that Pat has his own apartment, and that Pat had not been to her home for a month.  *See id.* at 1, 6.  She refused to entertain the idea that Pat could have touched her children, stating that it was "hog-wash" and "a waste of time," and that kids can make things up.  *Id.* at 2-8.

Teacher Jacob Evans, teacher Jessica Holt, and teacher's aide Whitney Lopez all indicated that Q.S. and L.S. are truthful children.  *See* Pls.' Joint Exhibits, Exh. H1 at 3 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Lopez); I1 at 1-2, 4 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Evans); J1 at 1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Holt).  Lopez described L.S. as clingy, and said L.S. had written a

3

letter asking Lopez to be her mother.  Pls.' Joint Exhibits, Exh. H1 at 1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Lopez).  Evans, who reported the suspected abuse, said that Q.S. had described how his uncle made him stay downstairs while taking L.S. upstairs for "secret special time."  Pls.' Joint Exhibits, Exh. I1 at 2 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview with Evans).

*Social Worker Ricks Takes Over the County's Investigation from Social Worker Castillo*

Castillo had to leave the school at the end of her workday.  *See* Lerable Decl. ¶ 7, ECF 115-4.  The County's investigation was taken over by standby Emergency Response social worker Justin Ricks.  *See id.*  When Ricks arrived at the school, Castillo told him that L.S. had been subject to sexual abuse in the home of her mother, Williams, that L.S.'s twin brother Q.S. had told Williams about the abuse, and that Williams had not believed Q.S. but instead had instructed him not to tell anyone.  *See* Ricks Decl. ¶ 5, ECF 115-3.

Ricks spoke to Williams and offered her two options to ensure the children's safety during the investigation of alleged sexual abuse – having a family member take the children or have the children taken into protective custody by the County.  *See* Pls.' Joint Exhibits, Exh. F1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Ricks Interview of Williams #1).  Williams said the children could go to her sister, Regina Mason, and placed a telephone call to Mason.  *See id.* at 1-2; Pls.' Joint Exhibits, Exh. G1 at 1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Ricks Interview of Williams #2).  A three-way conversation ensued between Ricks, Williams, and Mason, during which Ricks attempted to make a plan for Mason to come get the children.  *See* Pls.' Joint Exhibits, Exh. G1 at 1-2 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Ricks Interview of Williams #2).  Mason, a former Monterey County social worker, interrupted Ricks, insisted the children should stay with Williams, and threatened to call Ricks' superiors at the County.  *See id.* 1-12.  Williams denied that Pat could have touched L.S. and stated that children make things up.  *See id.* at 16-23.  The conversation ended with Mason saying she was on her way to the school but would be making calls while driving, presumably the threatened calls to Ricks' superiors.  *See id.* at 27.

Ricks subsequently proposed sending the children home with Whitney Lopez, the teacher's

United States District Court
Northern District of California

aide L.S. had asked to be her mom, explaining that Lopez was a licensed foster parent.  *See* Pls.' Joint Exhibits, Exh. K1 at 1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Ricks Interview of Williams #3).  Williams refused.  *See id.* at 1-2.  Ricks stated that he needed to call his superiors.  *See id.*

>    *A Decision is Made to Take L.S. and Q.S. into Protective Custody*

Ricks spoke on the telephone with his superiors Charlene Lord and Christine Lerable several times during the evening.  *See* Ricks Decl. ¶ 11; Lord Decl. ¶ 6, ECF 115-5; Lerable Decl. ¶¶ 9-12, ECF 115-4.  Lord was the standby Supervisor.  *See* Lord Decl. ¶ 6; Lerable Decl. ¶ 7. Lerable was acting as the Program Manager for the incident because the regular Emergency Response Program Manager had recused herself based on a personal relationship with Williams. *See id.* ¶ 11.  Ricks also spoke with law enforcement officers that were present at the school.  *See id.* ¶ 12.  Those officers included Officer Gonzalez, Officer Ziebell, and Sergeant Dana Cornelison.  *See* Ziebell Dep. 177:3-17, ECF 134-2.

A decision was made to remove the children, but it is unclear from this record who made the decision.  The Notice of Protective Custody was signed by law enforcement, but there is evidence that Ricks and his superiors actually made, or at least participated in, the decision.  *See* Pls.' Joint Exhibits, Exh. S at 10-11 (Delivered Service Log); Gonzalez Decl. Exh. 2 (Notification of Protective Custody), ECF 116-1.

>    *Social Worker Ricks Informs Williams that Minors will be Taken into Protective Custody*

Ricks returned to Williams and informed her that the children would be taken into protective custody.  *See* Pls.' Joint Exhibits, Exh. L1 at 1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Ricks Interview of Williams #4).  Williams questioned why the children were being taken when a plan had been made for them to go to her sister, Mason.  *See id.*  Ricks stated, "this has gone up the chain, supervisor and program manager knows what's going on."  *See id.*  Ricks then took the children to a vehicle, with Williams following and saying "[t]hat's not what we agreed on."  *See* Pls.' Joint Exhibits, Exh. M1 at 1 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Removal of Minors).  Police officers moved Williams back from the car as it left.  *See id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Social Worker Chacon Drafts Petition*

Lord and Lerable decided that in light of a potential conflict created by the recusal of one social worker due to a personal relationship with Williams, and the involvement of former social worker Mason, it would be best if another county took over the investigation. *See* Lerable Decl. ¶ 12. Santa Cruz County agreed to take over but could not do so until the following Monday. *See id.* Monterey County social worker Chelsea Chacon drafted the Petition to the Monterey County Juvenile Court, relying "on the 'delivered service log' investigation notes of Emergency Response and investigating social workers." Chacon Decl. ¶ 4, ECF 115-7. The children were out of Williams' custody for three months, at which time juvenile proceedings were dismissed after a contested trial. FAC ¶ 294.

*Plaintiffs File this Lawsuit*

Williams filed this lawsuit on April 4, 2019, on behalf of herself and as guardian *ad litem* for L.S. and Q.S. The operative first amended complaint ("FAC") contains six federal civil rights claims under 42 U.S.C. § 1983, and a state law claim for intentional infliction of emotional distress: (1) Violation of 4th Amendment – Seizure by Interrogation; (2) Violation of 14th Amendment – Interrogation of Minors; (3) Violation of 4th Amendment – Removal; (4) 14th Amendment Violation (Procedural); (5) 14th Amendment Violation (Substantive) – Interference Familial Association; (6) 14th Amendment Violation (Substantive) – Continuing Detention – Fraud; and (7) Intentional Infliction of Emotional Distress. The claims are asserted against the County of Monterey and its social worker employees Linda Castillo, Justin Ricks, Charlene Lord, Christine Lerable, Chelsea Chacon, and Rebecca Barron; and the City of Salinas and its law enforcement officers Guadalupe Gonzalez, Blake Ziebell, and Dana Cornelison.[1]

## II.   LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of*

---

[1] City of Salinas officers Mario Reyes, Jr., and Eduardo Bejarano, and County of Santa Cruz social workers Josefina Duran and Marcos Estrada, also are named as defendants in the FAC but they have been dismissed from the suit.

6

*Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."  *Id.*  "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."  *Id.*  "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor."  *City of Pomona*, 750 F.3d at 1049.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Id.* (internal quotation marks and citation omitted).

## III.   DISCUSSION

The County Defendants and the City Defendants move for summary judgment on all claims in the FAC, specifically, claims against the individual Defendants, claims against the County and the City under *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978), and claims for punitive damages.  In response to the motions, Plaintiffs concede Claims 1, 2, and 7, and all claims against individual Defendant Rebecca Barron.  *See* Opp. to County MSJ at 4-5, ECF 121; Opp. to City MSJ at 4, ECF 122.  Consequently, both motions for summary judgment are GRANTED as to Claims 1, 2 and 7.  The County Defendants' motion additionally is GRANTED as to all claims against Rebecca Barron.

Still at issue are Claims 3, 4, and 5, arising out of the children's removal, and Claim 6, arising out of alleged fraudulent statements in the Petition.  The Court begins its analysis with these two sets of claims as asserted against the individual Defendants.  Next, the Court takes up the *Monell* claims.  Finally, the Court addresses the motions for summary judgment on punitive damages.

### A.   County Defendants' Evidentiary Objections

Before turning to the parties' substantive arguments, the Court briefly addresses evidentiary objections raised in the County Defendants' reply brief.  *See* County Reply at 7-10,

United States District Court
Northern District of California

ECF 131.  The objections to the Declaration of Lyvesha Franklin (ECF 121-4) and the Declaration of

Priscilla Barrera (ECF 121-5), describing child welfare investigations unrelated to the investigation at

issue in this case, are SUSTAINED.  Those investigations are irrelevant to the issues raised by the

present motions for summary judgment.  The objections to citations to evidence that is not part of the

record are SUSTAINED.  The Court cannot consider evidence that is not before it.  The remainder of

the evidentiary objections amount to argument that certain of Plaintiffs' citations to evidence do not

actually support the point for which the evidence is cited.  Those objections are OVERRULED.  The

Court will decide what inferences and conclusions properly may be drawn from the cited evidence.  A

disagreement as to the significance of a particular piece of evidence does not constitute grounds to

exclude the evidence.

### B.      Claims 3, 4, and 5 (Individual Defendants)

Claims 3, 4, and 5 assert that Plaintiffs' constitutional rights were violated when

Defendants removed L.S. and Q.S. from Williams' custody without a warrant[2] or exigent

circumstances.  Claim 3 asserts that the minor Plaintiffs' Fourth Amendment rights were violated

when Defendants removed them from their mother's custody "without consent, probable cause, a

warrant, or exigent circumstances."  FAC ¶ 381.  Claim 4 asserts that Plaintiffs' Fourteenth

Amendment due process rights were violated "by the children's removal undertaken without

consent, probable cause, a protective custody warrant, or exigent circumstances justifying

removal."  FAC ¶ 385.  Claim 5 asserts that Plaintiffs' substantive Fourteenth Amendment rights

to familial association were violated by "the warrantless removal of the minor Plaintiffs from the

care, custody, and control of Monia on May 4th, 2018."  FAC ¶ 388.

These claims are asserted against individual County Defendants Castillo, Ricks, Lord, and

Lerable, and individual City Defendants Ziebell, Gonzalez, and Cornelison.

### 1.      Individual County Defendants

The County Defendants argue that they are entitled to summary judgment on Claims 3, 4,

---

[2] Under California Welfare and Institutions Code § 340, a judge may issue a protective custody
warrant directing a law enforcement officer or social worker to place a child in temporary custody,
when the court deems that "the circumstances of his or her home environment may endanger the
health, person, or welfare of the minor."

United States District Court
Northern District of California

1    and 5 as asserted against the individual social workers, because law enforcement made the

2    decision to take L.S. and Q.S. into protective custody.  Alternatively, the County Defendants argue

3    that the social workers are entitled to qualified immunity because exigent circumstances justified

4    the children's removal without a warrant, and the social workers' conduct did not violate clearly

5    established law.  In opposition, Plaintiffs dispute both the social workers' denial of involvement in

6    the removal decision and the existence of exigent circumstances.

7                                    **a.        Participation in Decision to Remove the Children**

8            The County Defendants argue that the individual social workers cannot be liable for

9    violations of Plaintiffs' civil rights stemming from removal of the children because law

10   enforcement made the decision to take the children into protective custody.  The County

11   Defendants rely on *Chen v. D'Amico*, 428 F. Supp. 3d 483, 505 (W.D. Wash. 2019), in which the

12   district court held that claims arising from a minor child's removal could not be asserted against

13   social workers where the child was taken into protective custody by law enforcement and then

14   turned over to child protective services.  The *Chen* court noted that at the time law enforcement

15   took the child into protective custody, one of the defendant social workers "was not yet on the

16   case" and the other defendant social worker "had not yet been hired by" the Department of Social

17   and Health Services.  *Id.  Chen* is factually distinguishable from the present action, in which

18   Castillo, Ricks, Lord, and Lerable were "on the case" before the children were taken into

19   protective custody and are alleged to have been involved in the removal decision.

20           Under California law, both law enforcement officers and social workers have statutory

21   authority to take minor children into protective custody where exigent circumstances exist.  *See*

22   Cal. Welf. & Inst. Code §§ 305 (law enforcement officers), 306 (social workers).  While asserting

23   conclusorily that "the County Defendants did not issue the order to take the minor Plaintiffs into

24   protective custody," the County Defendants do not direct the Court to any evidence establishing

25   who made the removal decision.  *See* County MSJ at 17-18.  Accordingly, the County Defendants

26   have failed to meet their initial burden on summary judgment of establishing that they were not

27   involved in the removal decision.

28           Even if the County Defendants had met their initial burden, the Court would find that

United States District Court
Northern District of California

9

1    disputed facts as to who made the decision preclude summary judgment on this ground.  It is not

2    apparent from the record who made the protective custody decision.  Ricks states in his declaration

3    that "[o]ne of the officers made the decision to take the minors into protective custody based on

4    exigent circumstances."  Ricks Decl. ¶ 12.  However, the Delivered Service Log documenting the

5    County's investigation indicates that when Ricks consulted Lord and Lerable, "SWS and PM

6    Lerable informed SW Ricks to take both children into protective custody now."  Pls.' Joint

7    Exhibits, Exh. S at 10 (Delivered Service Log).  The Delivered Service Log goes on to state, "SW

8    Ricks contacted Ofc Gonzalez and asked for her to write a protective custody order."  *Id.* at 11.  It

9    appears that Officer Gonzalez acquiesced to Ricks' request.  *See id.*; Gonzalez Decl. Exh. 2

10   (Notification of Protective Custody), ECF 116-1.  Ziebell testified at his deposition that the

11   decision to take the children into custody was "based on the conversations and agreements reached

12   with Sergeant Cornelison, Ms. Gonzalez, Mr. Ricks, and [himself]."  Ziebell Dep. 177:3-17, ECF

13   134-2.  On this record, disputed facts preclude summary judgment for the County social workers

14   based on their argument that law enforcement alone made the removal decision.

15        The Court notes that social worker Castillo left the school before the decision was made to

16   take the children into protective custody, and thus she had no direct involvement in the decision.

17   *See* Castillo Decl. ¶ 17, ECF 115-8.  Plaintiffs assert that Castillo nonetheless may be liable based

18   on her alleged conduct in "feeding Lord & Lerable false information," and "putting words in [the

19   children's] mouths."  Opp. to County MSJ at 20-21, ECF 121.  Plaintiffs rely on *Merritt v. Mackey*

20   and *Johnson v. Duffy* for the proposition that personal participation in the constitutional violation

21   is not required for section 1983 liability.  *See Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir.

22   1987); *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).  Those cases  hold that "[a]nyone

23   who 'causes' any citizen to be subjected to a constitutional deprivation is also liable."  *Johnson*,

24   588 F.2d at 743; *see also Merritt*, 827 F.2d at 1371 (citing *Johnson*).  "The requisite causal

25   connection can be established not only by some kind of direct personal participation in the

26   deprivation, but also by setting in motion a series of acts by others which the actor knows or

27   reasonably should know would cause others to inflict the constitutional injury."  *Johnson*, 588

28   F.2d at 743-44.

United States District Court
Northern District of California

The Court need not evaluate the viability of Plaintiffs' "setting in motion" theory of liability against Castillo, because the County Defendants have not sought summary judgment for Castillo on the ground that she left the school before the removal decision was made. The County Defendants' argument that they bear no responsibility for the protective custody decision is limited to their assertion that the decision was made by law enforcement. That argument is insufficient to establish the County social workers' entitlement to summary judgment for the reasons discussed above.

Accordingly, the County Defendants' motion for summary judgment on Claims 3, 4, and 5 on the basis that they did not make the decision to remove the children is DENIED.

### b.      Qualified Immunity

The County Defendants next argue that the social workers are entitled to qualified immunity for liability stemming from the children's removal from Williams' custody. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Demaree v. Pederson*, 887 F.3d 870, 878 (9th Cir. 2018) (quotation marks and citation omitted). Courts "use a two-step test to evaluate claims of qualified immunity, under which summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the violation." *Id.* (quotation marks and citation omitted).

### i.      Violation of a Constitutional Right

The Court begins with the first step of the qualified immunity inquiry, whether the facts show that the defendant social workers violated Plaintiffs' constitutional rights. Claims 3, 4, and 5 assert constitutional violations arising from the removal of L.S. and Q.S. from Williams' custody without a warrant or exigent circumstances.

Parents and children have a "well-elaborated constitutional right to live together without governmental interference." *Demaree*, 887 F.3d at 878. "There are narrow circumstances in which the government may constitutionally remove children from their families temporarily

11

without judicial authorization." *Id.* Exigent circumstances justifying removal exist where there is "specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse." *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). Even if state action is reasonable under the circumstances, "the scope and degree of the state interference [must be] justified by the alleged exigency." *Id.* at 1140. In *Demaree*, the Ninth Circuit summarized the exigency requirement as follows: "In an emergency, government officials may take a child out of her home and away from her parents without a court order when officials have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Demaree*, 887 F.3d at 878 (quotation marks and citation omitted).

The County Defendants argue that Plaintiffs' constitutional rights were not violated under these standards, because exigent circumstances justified removal of the children. In particular, the County Defendants argue that the initial investigatory interviews at the school indicated that L.S. had been sexually abused in her home, Williams had failed to protect L.S., and Williams had become hostile toward Ricks when he attempted to develop an appropriate safety plan. Ricks, Lord, and Lerable have submitted declarations explaining why they believed exigent circumstances existed to take the children into protective custody. *See* Ricks Decl. ¶ 12; Lord Decl. ¶ 10; Lerable Decl. ¶ 11. Lord states that she believed exigency existed based on the allegations of sexual abuse in the home by someone with repeated access to L.S., Williams' failure to protect L.S., Williams' statements that kids make stuff up, and the concern that Williams and Mason would attempt to coerce the children into recanting their stories if the children went home with Williams. *See* Lord Decl. at ¶¶ 7-9.

While the County Defendants' evidence supports the existence of reasonable cause to believe L.S. was at risk of sexual abuse, it does not support the existence of reasonable cause to believe L.S. was in *imminent* danger of sexual abuse, that is, danger of suffering sexual abuse *in the time that would be required to obtain a warrant*. *See Demaree*, 887 F.3d at 878. The County Defendants offer no evidence whatsoever on how long it would have taken to obtain a warrant. Absent such evidence, the County Defendants have failed to meet their initial burden on summary judgment under the applicable legal standard.

1    Even if the County Defendants had met their initial burden, the Court would find the

2    existence of disputed issues of fact.  As Plaintiffs note in their opposition, both L.S. and Williams

3    told Officer Ziebell that Pat had not been to Williams' home in approximately a month.  *See* Pls.'

4    Joint Exhibits, Exh. D1 at 11-12 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview

5    with L.S.); Pls.' Joint Exhibits, Exh. E1 at 6 (Tr. of Ziebell's Body Cam Footage of May 4, 2018

6    Interview with Williams).  Ziebell testified that he, Gonzalez, Cornelison, and Ricks had a

7    discussion before they agreed to remove the children.  *See* Ziebell Dep. 177:3-17, ECF 134-2.  A

8    reasonable inference may be drawn that Ziebell disclosed what he knew about Pat, including that

9    Pat had not been at the house for some time.  The Court finds that there is a genuine issue of

10   material fact as to whether there was reasonable cause to believe that L.S. was at risk of sexual

11   abuse from Pat if the social workers waited to remove her for the period of time it would have

12   taken to get a warrant.

13   Moreover, Plaintiffs correctly point out that the County Defendants have not offered any

14   evidence that *Q.S.* was in imminent danger of abuse.  "[T]he claims of each family member must

15   be assessed separately."  *Wallis v. Spencer*, 202 F.3d 1126, 1142 n.14 (9th Cir. 2000).  Absent any

16   evidence of danger to Q.S., the Court finds that the County Defendants have failed to meet their

17   initial burden on summary judgment with respect to claims arising from removal of Q.S. from

18   Williams' custody.

19   In conclusion, the Court finds that the County social workers are not entitled to summary

20   judgment under the first prong of the qualified immunity test, both because they have failed to

21   meet their initial burden and because there are genuine issues of material fact as to whether

22   exigent circumstances justified the removal of either L.S. or Q.S. from Williams' custody.

23                              **ii.      Clearly Established**

24   The Court next turns to the second step of the qualified immunity inquiry, whether the

25   rights allegedly violated were clearly established at the time of the violation.  The Court has no

26   difficulty concluding that they were.  The "narrow circumstances in which the government may

27   constitutionally remove children from their families temporarily without judicial authorization"

28   were described in *Demaree*, which issued on January 23, 2018 and was amended in other respects

13

on April 6, 2018.  The removal of L.S. and Q.S. occurred afterward, on May 4, 2018.

Moreover, *Demaree* made clear that the contours of the exigency requirement for a warrantless removal of children from their parents' custody had been clearly established by cases going back many years.  *See Demaree*, 887 F.3d at 881-84 (discussing cases).  For example, *Demaree* cited *Mabe v. San Bernardino Cty.*, involving a social worker's warrantless removal of a teen whose stepfather touched her breasts and crotch through her clothing repeatedly over two or three months.  *See Mabe*, 237 F.3d 1101, 882 (9th Cir. 2001).  The *Mabe* court declined to hold as a matter of law that those facts met the exigency requirement, noting that the abuse happened only at night and did not involve penetration or violence.  *See id.*  The Ninth Circuit found it difficult to understand how delaying removal of the teen for the few hours necessary to obtain a warrant would have put her in danger of serious physical injury.  *See id.*  The Ninth Circuit thus determined that a reasonable jury could conclude that the mother's constitutional rights were violated.  *See id.*  Based on *Mabe* and other cases, *Demaree* concluded that "the case law was clear in 2008 that it does not matter whether the warrant could be obtained in hours or days.  What matters is whether there is an identifiable risk of serious harm or abuse *during whatever the delay period is*."  *Demaree*, 887 F.3d at 883.  Thus, in May 2018, *Demaree*, *Mabe*, and their predecessors "gave clear notice of the law to social workers responsible for protecting children from sexual abuse and families from unnecessary intrusion."  *Id.* at 884.

The County Defendants attempt to reframe the constitutional violation at issue, asserting that "County Defendants need only demonstrate that they were not incompetent and were objectively reasonable, in concurring with the Salinas Police Department's decision to take the minor plaintiffs into protective custody."  County MSJ at 18, ECF 115.  The County Defendants cite *Sjurset v. Button*, in which police officers acted at the direction of social workers in removing two young children from their father.  *See Sjurset v. Button*, 810 F.3d 609, 612 (9th Cir. 2015).  The issue considered by the Ninth Circuit was whether "the law clearly established that the Stayton officers could not act pursuant to DHS's protective-custody determination in entering Sjurset's house and removing the children without a court order."  *Id.* at 617.  The *Sjurset* court concluded that there was no law "clearly establishing that reasonable officers in the Stayton

officers' situation would have understood that they had a constitutional responsibility to second-guess DHS's protective-custody determination." *Id.* at 618.  Importantly, the court's determination turned on the undisputed fact that the law enforcement officers did not participate in the removal decision, but relied solely on the social worker's determination that removal was justified.  *See id.*

> *Sjurset* is inapplicable here, where Plaintiffs do not allege that the County social workers simply concurred in or failed to second-guess a law enforcement decision to take the children into protective custody.  Plaintiffs claim that the County social workers participated in the removal decision.  In *Sjurset*, the Ninth Circuit made clear that its holding would not extend to those circumstances, stating:  "To be sure, if the Stayton officers had participated in the decision to take protective custody of Sjurset's children, then our precedent in *Wallis* and similar cases would clearly establish that the officers could not do so without a reasonable basis for believing that the children were in imminent danger." *Sjurset*, 810 F.3d at 618.  Accordingly, *Sjurset* does not provide support for the County social worker's motion in the present case.

> The County Defendants' motion for summary judgment on Claims 3, 4, and 5 on the basis of qualified immunity is DENIED as to the individual social workers.

### 2.    Individual City Defendants

> The City Defendants argue that they are entitled to summary judgment on Claims 3, 4, and 5 as asserted against the individual law enforcement officers on the basis of qualified immunity.  In opposition, Plaintiffs dispute the law enforcement officers' entitlement to qualified immunity.

#### a.    Violation of a Constitutional Right

> At step one of the qualified immunity analysis, the City Defendants argue that Plaintiffs cannot establish a violation of their constitutional rights arising from the warrantless removal of L.S. and Q.S. from Williams' custody.  The City Defendants present evidence that the initial investigatory interviews at the school indicated that L.S. had been sexually abused in her home, Williams had failed to protect L.S., and Williams had denied the abuse occurred and said that kids make things up.  That evidence includes the transcripts of the videos taken by Ziebell's body camera of interviews with Q.S., L.S., and Williams; Ziebell's police report; and Ziebell's

1   deposition regarding the events of May 4, 2018.  *See* Pls.' Joint Exhibits, Exh. C1 at 13 (Tr. of

2   Ziebell's Body Cam Footage of May 4, 2018 Interview with Q.S.), Exh. D1 at 4 (Tr. of Ziebell's

3   Body Cam Footage of May 4, 2018 Interview with L.S.), Exh. E1 (Tr. of Ziebell's Body Cam

4   Footage of May 4, 2018 Interview with Williams), ECF 124; Gonzalez Decl. Exh. 1 (Police

5   Report), ECF 116-1; Ziebell Dep. 172:8-176:13, ECF 134-2.

6         While this evidence supports the existence of reasonable cause to believe L.S. was at risk

7   of sexual abuse, it does not support the existence of reasonable cause to believe L.S. was in

8   *imminent* danger of sexual abuse, that is, danger of suffering sexual abuse *in the time that would

9   be required to obtain a warrant*.  *See Demaree*, 887 F.3d at 878.  The City Defendants argue

10  conclusorily that "[t]hough officers had been told that UNCLE did not live in the home, they did

11  not have a reliable means of determining that UNCLE would not have access to the twins during

12  the time necessary to get a warrant."  City MSJ at 10, ECF 116.  However, the City Defendants

13  offer no evidence as to how long it would have taken to get a warrant.  Absent such evidence, the

14  City Defendants have failed to meet their initial burden on summary judgment under the

15  applicable legal standard.

16        Even if the City Defendants had met their initial burden, the Court would find that

17  summary judgment is precluded by disputed facts as to the existence of exigency.  Ziebell was told

18  by both L.S. and Williams that Pat had not been to the house in approximately a month.  *See* Pls.'

19  Joint Exhibits, Exh. D1 at 11-12 (Tr. of Ziebell's Body Cam Footage of May 4, 2018 Interview

20  with L.S.); Pls.' Joint Exhibits, Exh. E1 at 6 (Tr. of Ziebell's Body Cam Footage of May 4, 2018

21  Interview with Williams).  On this record, the Court finds that there is a genuine issue of material

22  fact as to whether there was reasonable cause to believe that L.S. was at risk of sexual abuse from

23  Pat if the law enforcement officers waited to remove her for the period of time it would have taken

24  to get a warrant.

25        The City Defendants suggest that Williams' older son Khalil posed an additional threat of

26  sexual abuse to L.S., relying on a forensic interview of L.S. conducted on May 5, 2018, the day

27  after she was taken into protective custody.  *See* Gonzalez Decl. Exh. 8 at 30:24-36:13 (Transcript

28  of Forensic Interview of L.S. on May 5, 2018).  In that interview, L.S. made statements indicating

United States District Court
Northern District of California

16

1    that Khalil woke her in the night and exposed himself to her.  *See id.*  The City Defendants also

2    submit evidence that at some point Khalil pled guilty to kidnaping an eight-year-old girl.  *See*

3    Multipassi Decl. Exh. 6 at 94:17-23 (Khalil Dep.), ECF 116-2.  There is no indication that the City

4    Defendants were aware of these facts regarding Khalil on May 4, 2018.  Thus, the evidence

5    regarding Khalil does not support the existence of reasonable cause to believe that L.S. was in

6    imminent danger of sexual abuse at the time she was taken into protective custody.

7        Moreover, the City Defendants have not offered any evidence that *Q.S.* was in imminent

8    danger of abuse.  "[T]he claims of each family member must be assessed separately."  *Wallis v.*

9    *Spencer*, 202 F.3d 1126, 1142 n.14 (9th Cir. 2000).  Absent any evidence of danger to Q.S., the

10   Court finds that the City Defendants have failed to meet their initial burden on summary judgment

11   with respect to claims arising from removal of Q.S. from Williams' custody.

12       In conclusion, the Court finds that the City's law enforcement officers are not entitled to

13   summary judgment under the first prong of the qualified immunity test, both because they have

14   failed to meet their initial burden and because there are genuine issues of material fact as to

15   whether exigent circumstances justified the removal of either L.S. or Q.S. from Williams' custody.

### b.       Clearly Established

17       At step two of the qualified immunity analysis, the Court must determine whether the

18   constitutional rights allegedly violated by the City's law enforcement officers were clearly

19   established.  As discussed above in connection with the County Defendants' motion, the Court has

20   no difficulty concluding that in May 2018, *Demaree*, *Mabe*, and their predecessors "gave clear

21   notice of the law to social workers responsible for protecting children from sexual abuse and

22   families from unnecessary intrusion."  *Demaree*, 887 F.3d at 884.  Specifically, those cases clearly

23   established that government officials may not remove a child from her parent's custody without a

24   court order unless the officials "have reasonable cause to believe that the child is likely to

25   experience serious bodily harm in the time that would be required to obtain a warrant."  *Demaree*,

26   887 F.3d at 878 (quotation marks and citation omitted).  *Demaree* and *Mabe* equally apply to law

27   enforcement.

28       At the hearing, the City Defendants' attorney cited *Ram v. Rubin* for the proposition that

United States District Court
Northern District of California

17

where there are corroborated allegations of serious sexual abuse, an inference of imminent danger arises that is sufficient to justify removal of the child without consideration of the time necessary to get a warrant. *See* Hrg. Tr. 15:24-16:4, ECF 155. *Ram* involved the warrantless removal of five adopted sons and one foster son from the custody of Jay Ram following one of the boy's allegations of sexual abuse. *See Ram v. Rubin*, 118 F.3d 1306, 1308 (9th Cir. 1997). The district court granted summary judgment for the defendant social worker and denied summary judgment for the defendant police officer. *See id.* at 1308. The Ninth Circuit reversed the grant of summary judgment for the social worker and affirmed the denial of summary judgment for the police officer. *See id.*

The *Ram* court held that the law governing warrantless removal of minors was clearly established, holding: "In 1993, it was clear that a parent had a constitutionally protected right to the care and custody of his children and that he could not be summarily deprived of that custody without notice and a hearing, except when the children were in imminent danger." *Id.* at 1310. The Ninth Circuit determined that the district court properly denied summary judgment on qualified immunity grounds to the defendant police officer based on disputed facts relating to the reasonableness of his belief that the children could be removed. *See id.* at 1311. The language relied on by the City Defendants was part of the Ninth Circuit's determination that qualified immunity also was not appropriate with respect to the defendant social worker. The court indicated that although "[a]n indictment or serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody," that was not true in the circumstances before it because the social worker had other information that called into doubt whether there was imminent danger to the children. *See id.* That information included two prior investigations of sexual abuse allegations that were found to be unconfirmed. *See id.*

In this Court's view, nothing in this holding supports the reading of *Ram* urged by the City Defendants, that where there are serious allegations of sexual abuse a minor may be removed from her parent's custody without a determination whether the minor would be a risk if left in the parent's custody for the time necessary to obtain a warrant. Most obviously, the *Ram* court simply

did not address how the availability of a warrant plays into the evaluation of exigency necessary to remove a minor from parental custody.  *Ram* issued more than twenty years before *Demaree*, which clearly holds that the time necessary to obtain a warrant must be factored into the exigency determination.  Thus, if there were a conflict between the cases, this Court would rely on *Demaree*.

At the hearing, the City Defendants' counsel attempted to distinguish *Demaree*, asserting that because *Demaree* did not involve sexual abuse it does not call into question the inference of exigency that the City Defendants contend arose in the present case under *Ram*.  While the conduct at issue in *Demaree* was sexual exploitation of minors through photographs rather than sexual molestation, cases cited in and relied on by *Demaree* did involve sexual molestation.  For example, in *Mabe*, issued several years after *Ram*, there were credible allegations that a teen had been sexually abused over a period of months by her stepfather, who came into her room at night and touched her breasts and crotch through her clothing.  *See Mabe*, 237 F.3d at 882.  The *Mabe* court declined to hold as a matter of law that those facts met the exigency requirement, because it was unclear that the teen would have been at risk for serious physical injury if left in her parents' custody while a warrant was obtained.  *See id.*

Because the City Defendants have failed to establish entitlement to summary judgment under either prong of the qualified immunity inquiry, their motion for summary judgment on Claims 3, 4, and 5 is DENIED as to the individual law enforcement officers.

### C.   Claim 6 (Individual Defendants)

Claim 6 alleges that Defendants violated Plaintiffs' Fourteenth Amendment substantive due process rights to familial association by including fraudulent information, and omitting exculpatory information, in the Petition submitted to the Juvenile Dependency court, which resulted in continued separation of the family after the initial removal of the children.  FAC ¶¶ 392-99.  Claim 6 also asserts that the fraudulent statements and omissions in the Petition violated the children's Fourth Amendment rights to be free from unreasonable seizures.  FAC ¶ 397.

Plaintiffs allege that the Petition was fraudulent because it omitted the information that L.S. and Q.S. could not be qualified as understanding the difference between truth and lie.  FAC ¶

361.  Plaintiffs also allege that the Petition contained the following misrepresentations:  "The Petition fraudulently claimed Monia 'knew' about some manner of sexual abuse or molestation of her children but did nothing about it," FAC ¶ 362; "The Petition fraudulently claimed that L.S. 'circled [on the little girl drawing] the places she had been touched that made her feel uncomfortable which included the back, foot, buttocks, vagina area, and face.'  The drawing CASTILLO provided to ZIEBELL in fact did not have a single body part circled," FAC ¶ 363; "The Petition falsely stated that E.S. lived in the home; he did not," FAC ¶ 364; "Though the Petition included claims of a 'licking game' involving L.S. and Pat, the Petition omitted the fact that Q.S. had described how L.S. and Pat had said the 'licking game' involved 'ice cream'; a material fraudulent omission," FAC ¶ 365.

Claim 6 is asserted against individual County Defendants Castillo, Ricks, Lord, Lerable, and Chacon, and individual City Defendants Ziebell, Gonzalez, and Cornelison.

### 1.     Individual County Defendants

The County Defendants argue that they are entitled to summary judgment on Claim 6 as asserted against the individual social workers, because the record is devoid of evidence that the social workers violated Plaintiffs' constitutional rights.  In opposition, Plaintiffs argue that disputed facts preclude summary judgment on Claim 6.

All Plaintiffs are protected under the Fourteenth Amendment, and L.S. and Q.S. are protected under the Fourth Amendment, "against deliberate government use of perjured testimony and fabricated evidence in the dependency court proceeding designed to rupture" their familial relationship.  *Hardwick v. Cty. of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017); *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) ("[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake.").  To prevail on a claim for deliberate fabrication of evidence, a plaintiff must, "at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or

1    should have known that those techniques would yield false information." *Costanich*, 627 F.3d at

2    1111 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)).  However, a "careless or

3    inaccurate investigation that does not ensure an error-free result does not rise to the level of a

4    constitutional violation." *Id.* (quoting *Devereaux*, 263 F.3d at 1076-77).

5          The County Defendants argue that under these standards, there is simply no record

6    evidence supporting a claim of deliberate fabrication against the individual social workers.  As the

7    County points out, most of the individual social workers were not involved in drafting the Petition

8    to the Juvenile Court.  Indeed, it appears that social worker Chelsea Chacon alone drafted the

9    Petition.  *See* Chacon Decl. ¶ 4, ECF 115-7.  Chacon relied "on the 'delivered service log'

10   investigation notes of Emergency Response and investigating social workers."  *Id.*  There does not

11   appear to be any evidence that Chacon had reason to believe that the materials on which she relied

12   were unreliable.  This evidence is sufficient to meet the County Defendants' initial burden on

13   summary judgment.  The burden thus shifts to Plaintiffs to present evidence from which a

14   reasonable jury could find that the social workers are liable for deliberate fabrication of evidence

15   in the Petition.

16         Plaintiffs argue that Chacon is not entitled to summary judgment because she signed the

17   Petition under penalty of perjury when she admittedly did not have personal knowledge of the

18   facts set forth therein.  None of the cases cited by the parties suggest that a social worker who, like

19   Chacon, prepares a Petition based on the notes of the investigating social workers, may be liable

20   for deliberate fabrication of evidence based on lack of personal knowledge.  Plaintiffs also argue

21   that Chacon may be liable based on her omission of critical facts from the Petition, for example,

22   that the children could not be qualified.  While Chacon's omission of such facts "may have been

23   careless or inaccurate," that alone is insufficient to give rise to liability for deliberate fabrication.

24   *See Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003).

25         To the extent Plaintiffs assert that social workers Castillo, Ricks, Lord, and Lerable may be

26   liable for deliberate fabrication based on the manner in which they conducted the investigation,

27   *Gausvik v. Perez* is instructive.  In *Gausvik*, the defendant police officer, Perez, investigated the

28   plaintiff, Gausvik, for sexual abuse of his children.  *See id.* at 814-15.  Perez interviewed

United States District Court
Northern District of California

Gausvik's children multiple times and misstated the children's responses and physical examination results in an affidavit of probable cause. *See id.* at 815. Gausvik was convicted of sexual abuse of two of his children and he served five years in prison before the state appellate court remanded the matter to the superior court for determination of the reliability of the victim's accusations. *See id.* at 815-16. The prosecutor thereafter dismissed the charges, and Gausvik sued Perez for deliberate fabrication of evidence. *See id.* at 816. The Ninth Circuit held that Perez was entitled to summary judgment on the basis that Gausvik had not presented evidence of a constitutional violation. *See id.* at 817.

Gausvik alleged that "Perez used overbearing tactics in interviewing the children, which he knew would yield false information. *Gausvik*, 345 F.3d at 817. The Ninth Circuit held that "an allegation that an interviewer disbelieved an initial denial and continued with aggressive questioning of the child cannot, without more, support a deliberate-fabrication-of-evidence claim, even if the allegation is amply supported by the evidence." *Id.* The Ninth Circuit determined that Perez's child interviews were insufficient to prove the deliberate fabrication claim, because Gausvik "failed to show by independent evidence that Perez knew or should have known his interview tactics would yield false information." *Id.* Plaintiffs in the present case likewise have failed to identify independent evidence that Castillo or Ricks knew or should have known their interview tactics during the investigation would yield false information.

Gausvik argued that Perez falsified his affidavit for probable cause. The affidavit contained several misstatements, for example, that Gausvik's children tested "positive" for sexual abuse when in fact the tests were only suggestive of or consistent with sexual abuse. *Gausvik*, 345 F.3d at 817. The affidavit also stated that eight children accused Gausvik of sexual abuse when only two had done so. *See id.* The Ninth Circuit concluded that those discrepancies showed only "that Perez carelessly handled the facts and the investigation." *Id.* The Ninth Circuit noted that Gausvik had "not pointed to any facts showing Perez knew he was innocent." *Id.* Accordingly, while the Ninth Circuit found that "Perez's affidavit may have been careless or inaccurate," it did not satisfy the "stringent test" for deliberate fabrication, and Perez thus was entitled to summary judgment. *Id.*

1       Applying *Gausvik* here, this Court concludes that Plaintiffs' challenges to the social

2   workers' interview techniques are insufficient to create a material issue of fact, as Plaintiffs have

3   "failed to show by independent evidence that [Castillo, Ricks, Lord, or Lerable] knew or should

4   have known [their] interview tactics would yield false information." *Gausvik*, 345 F.3d at 817.

5   Moreover, Plaintiffs have failed to present evidence from which a reasonable trier of fact could

6   conclude that the social worker defendants intentionally included inaccuracies or omissions in

7   their notes and reports, in the hopes those inaccuracies or omissions in turn would be included in

8   the Petition.  As in *Gausvik*, Plaintiffs' assertions of fraudulent content in the underlying materials

9   relied on by Chacon to prepare the Petition at most suggest carelessness and inaccuracies by the

10  social workers.  In the Court's view, the alleged inaccuracies in the present case are similar to

11  those found in *Gausvik*, where the defendant officer falsely stated that Gausvik's children tested

12  "positive" for sexual abuse and that eight children had accused Gausvik when only two children

13  had done so.  *Gausvik*, 345 F.3d at 817.  Here, the social workers are alleged to have

14  misrepresented Williams' knowledge of the alleged abuse, and to have omitted critical facts such

15  as the failure to qualify the minors and the reference to ice cream when discussing the licking

16  game.  *See* FAC ¶¶ 361-65.  As in *Gausvik*, however, Plaintiffs have not pointed to any facts

17  showing that the social workers knew the abuse did not occur.  To the contrary, the record strongly

18  suggests the social workers believed the abuse *did* occur.  Accordingly, while Plaintiffs have

19  presented evidence showing that the social workers' investigation and reporting "may have been

20  careless or inaccurate," no reasonable trier of fact could find that Plaintiffs' evidence satisfies the

21  "stringent test" for deliberate fabrication."  *See Gausvik*, 345 F.3d at 817.

22      The County Defendants' motion for summary judgment on Claim 6 is GRANTED as to

23  social workers Castillo, Ricks, Lord, Lerable, and Chacon.

24              **2.      Individual City Defendants**

25      The City Defendants argue that they are entitled to summary judgment on Claim 6 as

26  asserted against the individual law enforcement officers, because they were not involved in

27  preparation of the Petition.  The City Defendants argue that they are entitled to qualified immunity

28  with respect to Claim 6 on the same basis, because Plaintiffs will not be able to prove violation of

United States District Court
Northern District of California

United States District Court
Northern District of California

1    a constitutional right at step one of the qualified immunity analysis.  In opposition, Plaintiffs argue

2    that disputed facts preclude summary judgment on Claim 6.

3         The City Defendants point out that social worker Chacon, not the individual law

4    enforcement officers, drafted and submitted the Petition to the Juvenile Court.  Moreover, to the

5    extent Plaintiffs assert that the police reports were considered in support of the Petition, the City

6    Defendants argue that the Petition was filed on May 8, 2018, but the police reports were not

7    transmitted to the social workers until three days later on May 11, 2018.  *See* Pls.' Joint Exhibits,

8    Exh. U (Police Reports); Exh. BB (Petition).  The City Defendants' lack of involvement in

9    preparing the Petition, and evidence indicating that the police reports were not transmitted to the

10   social worker who prepared the Petition or to the Juvenile Court until after the Petition was filed,

11   is sufficient to meet the City Defendants' initial burden on summary judgment with respect to

12   Plaintiffs' claim of deliberate fabrication of the Petition.  The burden thus shifts to Plaintiffs to

13   present evidence from which a reasonable jury could find that the law enforcement officers are

14   liable for deliberate fabrication of evidence in the Petition.

15        Plaintiffs assert that the police officers knew their police reports would be relied on, and

16   that "[i]t is sufficient to establish liability, to show that a Defendant set in motion a series of acts

17   by others which the Defendant knows or reasonably should know would cause others to inflict a

18   constitutional injury."  Opp. to City MSJ at 18, ECF 122.  Plaintiffs' argument is at odds with the

19   "stringent test" for deliberate fabrication of evidence, under which Plaintiffs must show either that

20   Gonzalez, Ziebell, and Cornelison continued their investigation despite the fact that they knew or

21   should have known there was no abuse, or that Gonzalez, Ziebell, and Cornelison used

22   investigative techniques that were so coercive and abusive that they knew or should have known

23   those techniques would yield false information.  *See Gausvik*, 345 F.3d at 816-17.

24        As with the social workers discussed above, Plaintiffs have failed to present evidence from

25   which a reasonable trier of fact could conclude that the law enforcement officers intentionally

26   included inaccuracies or omissions in their reports, in the hopes those inaccuracies or omissions in

27   turn would be included in the Petition.  It is not even clear from Plaintiffs' FAC and briefing what

28   fraudulent content in the police report Plaintiffs believe give rise to liability on the part of the

1   officers.  Moreover, Plaintiffs have not pointed the Court to any evidence that inaccuracies in the

2   police reports resulted from anything other than carelessness.  Plaintiffs likewise have not pointed

3   to any "independent evidence that [Gonzalez, Ziebell, or Cornelison] knew or should have known

4   [their] interview tactics would yield false information," or knew the abuse did not occur.  To the

5   contrary, the record strongly suggests the officers believed the abuse *did* occur.  Accordingly, even

6   assuming that Plaintiffs have shown that the police officers' investigation and reporting "may have

7   been careless or inaccurate," no reasonable trier of fact could find that Plaintiffs' evidence satisfies

8   the "stringent test" for deliberate fabrication."  *See Gausvik*, 345 F.3d at 817.

9       The City Defendants' motion for summary judgment on Claim 6 is GRANTED as to

10  individual law enforcement officers Gonzalez, Ziebell, and Cornelison.

11      **D.**   ***Monell* Claims**

12      In addition to their claims asserted against the individual Defendants, Plaintiffs assert

13  *Monell* claims against the County of Monterey and the City of Salinas.  Unfortunately, Plaintiffs

14  chose not to include the County and the City in the captions of their claims.  For example, the

15  caption of Claim 3 includes the following:  "[Q.S. & L.S. v. Ziebell, Gonzalez, Cornelison, Reyes,

16  Bejarano, Castillo, Ricks, Lerable, Baron, Lord].  The captions of Plaintiffs' other claims contain

17  similar bracketed information indicating that the claims are asserted only against individual

18  Defendants.  Moreover, the text of the claims themselves focuses on the conduct of the individual

19  Defendants.  *See* FAC ¶¶ 380-391.  It is only when the FAC as a whole is read closely that it

20  becomes apparent that Plaintiffs do in fact assert *Monell* claims against the County and the City.

21  The FAC alleges at paragraph 366 that, "Though the COUNTY and CITY is not repeated in the

22  headings or body of every claim set forth below, due to the policies, practices, and customs, and/or

23  the non-existent or inadequate training by COUNTY and CITY, Plaintiffs allege they are also

24  Defendants for each claimed violation of constitutional rights alleged herein pursuant to the 4th or

25  14th Amendment, under the theory of liability commonly referred to as '*Monell* liability.'"  FAC ¶

26  366.

27      Both the County Defendants and the City Defendants contend that the FAC does not

28  properly encompass *Monell* claims, and the *Monell* claims are accorded fairly cursory treatment in

the motion briefing.  However, the Court finds that the FAC does allege *Monell* liability against the County and City for the asserted constitutional violations.  At the hearing, the Court indicated that the only potentially viable *Monell* claim it could glean from the FAC and briefing is a claim for failure to train, and Plaintiffs' counsel confirmed that the *Monell* claims are limited to failure to train.

"[A] municipal defendant can be held liable because of a failure to properly train its employees only if the failure reflects a 'conscious' choice by the government." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016).  "In other words, the government's omission must amount to a 'policy' of deliberate indifference to constitutional rights." *Id.*  "A plaintiff can satisfy this requirement by showing that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 793-94 (quotation marks and citation omitted).

As the only claims remaining in the FAC with respect to the individual Defendants are Claims 3, 4, and 5, the Court addresses the potential *Monell* liability of the County and the City only as to those claims.  "[I]n order to impose liability on a municipality under this theory there must be some underlying constitutional violation." *Andrade v. City of Burlingame*, 847 F. Supp. 760, 767 (N.D. Cal. 1994).  The Court first takes up the County Defendants' motion for summary judgment on Plaintiffs' failure to train claim, and then it turns to the City Defendants' motion.

### 1.    County

In light of the clarifications made by Plaintiffs in their briefing and at the hearing, the Court construes Plaintiffs' *Monell* claim to assert a failure to train County social workers and City law enforcement officers on the requirements for removal of minors without a warrant.  The County Defendants' argument on the *Monell* claims consists of a single page comprising the applicable legal standards.  *See* County MSJ at 22, ECF 115.  The County Defendants cite no evidence regarding the training provided to social workers.  This is understandable given that the County Defendants did not understand Plaintiffs to be asserting a *Monell* claim when filing the present motion for summary judgment.  However, absent any argument in the motion that the

County's training was adequate, or citation to evidence in the record establishing what training the County provided on exigency, the County Defendants cannot meet their initial burden on summary judgment.

The County Defendants cure this failure in their reply brief, asserting that "County social workers had been trained extensively on, among other topics, exigent circumstances, requirements for removal of children from parent/guardian custody, and how to obtain a warrant from the court." County Reply at 14, ECF 131. The reply brief also cites to evidence establishing that the County provided such training, including the declarations of Castillo, Ricks, Lord, Lerable, and Chacon. *See id.* That evidence was submitted with the County Defendants' motion papers, although it was not cited or argued in their opening motion brief.

While it ordinarily does not consider argument raised for the first time in reply to determine whether a party seeking summary judgment has met its initial burden, the Court finds it appropriate to do so in this case. The Ninth Circuit has held that this district's Civil Local Rules permit the filing of new matter in reply to summary judgment opposition papers. *See Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1171 (9th Cir. 2018) (citing N.D. Cal. Civ. L.R. 7-3(c)). "Where the opposing party believes he has been unfairly disadvantaged by a new factual matter included in a reply affidavit or declaration, the practice rules provide a mechanism to seek relief." *Id.* "The district court's Rule 7-3(d) provides the aggrieved party with the opportunity to object to the district court's consideration of the newly submitted evidence or to request leave to file a sur-reply opposition to it." *Id.* (citing N.D. Cal. Civ. L.R. 7-3(c)). In light of these local rules, the Ninth Circuit held in *Dutta* that the district court properly granted summary judgment for the defendant even though the only admissible evidence on a critical issue was submitted in reply to the opposition. *See id.* at 1172. The Ninth Circuit held that the opposing party waived any objection to the new reply matter by failing to raise an objection or request leave to file a sur-reply. *See id.*

While the evidence in question was submitted with the moving papers, it was not argued or drawn to the Court's attention until the County Defendants filed their reply brief. Based on *Dutta*, this Court finds it appropriate to consider the County Defendants' arguments and evidence on

*Monell* in determining whether they have met their initial burden on summary judgment. Moreover, the Court finds that evidence sufficient to meet the County Defendants' initial burden with respect to Plaintiffs' claim for failure to train. Castillo states in her declaration that during her career at the County of Monterey, she has "received training on investigating reports of sexual and physical abuse, the requirements for exigent circumstances and removal of children from custody of their parents or guardians without a warrant, as provided by the County Counsel's Office." Castillo Decl. ¶ 4, ECF 115-8. Ricks states in his declaration that, "During my career with Monterey County, I have received training on the requirements for exigent circumstances and removal of children from the custody of their parents or guardians without a warrant, as well as training on how to request a warrant from a court." Ricks Decl. ¶ 4, ECF 115-3. Lord's declaration states that while employed by Monterey County she "received training on the requirements for exigent circumstances and removal of children from custody of their parents or guardians without a warrant, as well as training on updates to federal and State laws, as provided by the County Counsel's Office." Lord Decl. ¶ 4, ECF 115-5. Lord acknowledges that she "would not have necessarily received training" on the Monterey County Family and Children's Services warrant process, because she was not assigned to the Emergency Response Unit. *Id.* Lerable states in her declaration that while at Monterey County she "received training on the requirements for exigent circumstances and removal of children from custody of their parents or guardians without a warrant, as well as training on updates to federal and State laws, as provided by the County Counsel's Office." Lerable Decl. ¶ 5, ECF 115-4. Jessica Perez-Martinez, the County's designated Person Most Knowledgeable ("PMK"), testified in her deposition that Monterey County provides training for obtaining protective custody warrants and has a written "Family and Children Services Program Directive" explaining the proper procedures. *See* Perez-Martinez Dep. 43:20-45:24, ECF 115-2.

This evidence is sufficient to meet the County Defendants' initial burden of proving that Monterey County trains its social workers on the requirements for removal of children from the custody of their parents without a warrant based on exigent circumstances, as well as training on how to request a protective custody warrant from a court. The burden thus shifts to Plaintiffs to

present evidence that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need" for such training.  *Kirkpatrick*, 843 F.3d at 793-94.

Plaintiffs point to deposition testimony in the record showing that neither Monterey County's PMK nor the social workers involved in this case knew of *any* instance in which a Monterey County social worker had sought a protective custody warrant to remove a child from parental custody rather than relying on exigent circumstances.  The County's PMK, Perez-Martinez, testified that during the eight months she worked as an emergency response social worker, she never applied for a protective custody warrant to remove a child.  *See* Pls.' Joint Exhibits, Exh. MM at 41:23-42:2 (Perez-Martinez Dep.).  Perez-Martinez also testified that during the two and a half years that she acted as a Monterey County social worker supervisor, social workers under her removed children from parental custody on 20-30 occasions, but in not one case did the social worker obtain a protective custody warrant.  *See id.* at 42:2-13.  Perez-Martinez testified that she personally has obtained a protective custody warrant for removal of a child, "but not in Monterey County."  *See id.* at 42:14-21.  Ricks, the social worker at the school when the removal decision was made in this case, testified that he has never obtained a warrant to remove a child from parental custody.  *See* Pls.' Joint Exhibits, Exh. Y at 56:23-25 (Ricks Dep.).  Ricks testified that during his entire career with Monterey County, he had never heard of any social worker obtaining a warrant to remove a child from parental custody.  *See id.* at 77:17-20.  Lord, who was the acting Supervisor on May 4, 2018, testified that she never received any training on how to apply for a protective custody warrant, is unaware of any other social worker receiving such training prior to the incident giving rise to this suit, and is unaware of any social worker under her ever applying for a protective custody warrant.  *See* Pls.' Joint Exhibits, Exh. DD at 21:23-22:16 (Lord Dep.).

Plaintiffs' evidence is sufficient to create a genuine issue of material fact precluding summary judgment on their *Monell* claim against the County.  Plaintiffs' theory is that the County has a *de facto* policy of removing children from parental custody without applying for a protective

United States District Court
Northern District of California

1    custody warrant, in violation of the applicable legal standard on exigency discussed above, which

2    authorizes a warrantless removal of a child only where the child is in *imminent* danger of suffering

3    abuse *in the time that would be required to obtain a warrant.  See Demaree*, 887 F.3d at 878.  The

4    fact that neither the County's PMK nor two of the social workers involved in the removal of L.S.

5    and Q.S. had ever obtained a protective custody warrant for removal of a child, nor heard of any

6    other Monterey County social worker obtaining a warrant for removal, supports Plaintiffs' theory.

7         In *Kirkpatrick*, the Ninth Circuit held that the County of Washoe was not entitled to

8    summary judgment on a *Monell* claim arising out of the warrantless removal of a child where there

9    was evidence supporting a constitutional violation, as well as "testimony that the County had no

10   policy of obtaining warrants before removing children from parental custody and that it was social

11   workers' regular practice to remove children regardless of the risk of imminent bodily harm."

12   *Kirkpatrick*, 843 F.3d at 796.  Here, there is evidence that in practice the County of Monterey

13   similarly had no policy of obtaining warrants and that it was social workers' regular practice to

14   remove children without considering the risk of imminent bodily harm in the time necessary to

15   obtain a warrant.  In *Kirkpatrick*, the Ninth Circuit determined that it was a question of fact for the

16   jury whether the county's customs and practices had a direct causal link to the deprivation of the

17   child's constitutional rights, and that "[a] reasonable jury could conclude that DSS's policy of

18   conducting warrantless seizures of children in non-exigent circumstances was the moving force

19   behind the warrantless removal" in that case.  *Id.*  Applying the reasoning of *Kirkpatrick*, this

20   Court concludes that viewing the record in the light most favorable to Plaintiffs, a reasonable trier

21   of fact could conclude that the County's training of its social workers was so inadequate as to

22   amount to deliberate indifference to the violation of the constitutional rights of Monterey County

23   families, and that the inadequate training was the moving force behind the constitutional violations

24   alleged in this case.

25        The County Defendants' motion for summary judgment on Plaintiffs' *Monell* claim is

26   DENIED.

27              **2.    City**

28        The Court next turns to Plaintiffs' *Monell* claim against the City Defendants.  The Court

construes the claim to assert the City's failure to train its law enforcement officers on the requirements for removal of minors without a warrant.  The City Defendants' moving papers contain approximately one page of argument on *Monell*, arguing that the FAC does not allege a *Monell* claim against the City and setting forth the legal standards governing *Monell*.  *See* City MSJ at 15-16, ECF 116.  The City Defendants' moving papers contain no argument or citation to evidence relevant to Plaintiffs' *Monell* claim.  However, for the reasons discussed above in connection with the County Defendants' motion on *Monell*, the Court considers the City Defendants' reply papers in determining whether they have met their initial burden on summary judgment.

In their reply, the City Defendants assert that Plaintiffs have not presented any evidence supportive of their *Monell* claim in opposition to the City Defendants' motion for summary judgment, and that Plaintiffs cannot prove a *Monell* violation with expert testimony.  *See* City Reply at 13-14, ECF 132.  While a party moving for summary judgment may satisfy its initial burden by pointing to an absence of evidence in the record, the City Defendants' argument does not acknowledge evidence on the *Monell* claim highlighted by Plaintiffs' opposition.  Nor do the City Defendants provide a citation for their assertion that Plaintiffs cannot prevail on their *Monell* claim absent expert testimony.  Accordingly, the Court finds that the City Defendants have failed to meet their initial burden with respect to Plaintiffs' *Monell* claim.

Moreover, Plaintiffs argue that the City of Salinas had a *de facto* policy of signing off on a protective custody removal form when asked to do so by Monterey County social workers.  Plaintiffs point to deposition testimony of Sergeant Cornelison, who has been with the Salinas Police Department since 1991.  *See* Pls.' Joint Exhibits, Exh. LL at 24:14-17 (Cornelison Dep.).  Cornelison stated that in his 29 years with the force, he is unaware of any instance in which a Salinas police officer declined a social worker's request to sign a protective custody removal form.  *See id.* at 30:2-7.  Cornelison also stated that he is unaware of any written policy requiring that patrol officers have training on sex abuse crimes involving minors.  *See id.* at 37:2-5.  Ziebell testified that he was not trained on how to request a warrant for removal of a child from parental custody, that he is unaware of any officer ever requesting a such a warrant, and that he is unaware

1   of a warrant being requested in any removal case in which Monterey County social workers were

2   involved.  *See* Pls.' Joint Exhibits, Exh. V at 44:4-8, 49:16-24.

3       Viewing the record in the light most favorable to Plaintiffs, there is evidence that the City

4   of Salinas does not train its officers on how to obtain a warrant for the removal of a child, when

5   removal is appropriate absent a warrant, and whether the City's law enforcement officers have a

6   practice of signing off on warrantless removals whenever requested to do so by County social

7   workers.  The Court concludes that it is a question of fact for the jury whether the City's alleged

8   practice had a direct causal link to the deprivation of Plaintiffs' constitutional rights, that is,

9   whether the City's alleged policy of simply signing off on removal at the County's request was the

10  moving force behind the warrantless removal in this case.  *See Kirkpatrick*, 843 F.3d at 796.

11      The City Defendants' motion for summary judgment on Plaintiffs' *Monell* claim is

12  DENIED.

13      **E.      Punitive Damages**

14      Plaintiffs seek punitive damages in this case.  As discussed above, the § 1983 claims

15  arising from removal of the children (Claims 3, 4, and 5) will go forward against both the County

16  Defendants and the City Defendants.  "[A] jury may be permitted to assess punitive damages in an

17  action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or

18  intent, or when it involves reckless or callous indifference to the federally protected rights of

19  others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  However, "a municipality is immune from

20  punitive damages under 42 U.S.C. § 1983."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247,

21  271 (1981).  Accordingly, liability for punitive damages potentially lies only against individual

22  County Defendants Castillo, Ricks, Lord, and Lerable, and individual City Defendants Gonzalez,

23  Ziebell, and Cornelison.

24      Defendants assert that there is an absence of evidence in the record that these individuals

25  acted with the requisite mental state to subject them to liability for punitive damages.  Plaintiffs do

26  not assert that the individual Defendants acted with evil motive or intent, but Plaintiffs argue that

27  the evidence they have presented regarding the individual Defendants' conduct creates at least

28  disputed facts as to whether those individuals acted with reckless or callous indifference to

United States District Court
Northern District of California

32

1    Plaintiffs' federally protected rights.

2          The individual Defendants are alleged to have violated Plaintiffs' Fourth Amendment and

3    Fourteenth Amendment rights by removing L.S. and Q.S. from Williams' custody without a

4    warrant and without reasonable cause to believe that the children were likely to experience serious

5    bodily harm in the time that would be required to obtain a warrant.  *See Demaree*, 887 F.3d at 878.

6    Based on the evidence discussed above in connection with Claims 3, 4, and 5, it is unclear whether

7    any of the individual Defendants made a determination that the risk of imminent injury was too

8    great to wait for a warrant, or even considered obtaining a warrant at all.  Viewing that evidence in

9    the light most favorable to Plaintiffs, a reasonable trier of fact could conclude that one or more of

10   the individual Defendants acted with reckless or callous indifference to Plaintiffs' federally

11   protected rights.  This conclusion is consistent with other district court decisions finding summary

12   judgment on punitive damages to be inappropriate where there are disputed facts as to the

13   defendants' conduct giving rise to the alleged constitutional violations.  *See, e.g., Scalia v. Cty. of*

14   *Kern*, No. 1:17-CV-01097-LJO-SKO, 2019 WL 4243225, at *9 (E.D. Cal. Sept. 6, 2019) ("Here,

15   as discussed above, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury

16   could find that Defendants were deliberately indifferent to Plaintiff's constitutional rights.");

17   *Jacobo-Esquivel v. Hooker*, No. CV-14-01781-PHX-GMS, 2016 WL 524655, at *8 (D. Ariz. Feb.

18   10, 2016) ("Viewing the facts in the light most favorable to Jacobo-Esquivel, a reasonable jury

19   could find that the officers' conduct exhibited reckless or callous indifference to Jacobo-

20   Esquivel's Fourth Amendment rights.").

21          The motions for summary judgment on punitive damages are DENIED as the County

22   Defendants and the City Defendants.

23   //

24   //

25   //

26   //

27   //

28   //

**IV.    ORDER**

(1)    The County Defendants' motion for summary judgment is:

    (a)    GRANTED as to Claims 1, 2, 6, and 7, and as to all claims asserted against individual County Defendants Rebecca Barron and Chelsea Chacon; and

    (b)    DENIED as to Claims 3, 4, and 5 with respect to individual County Defendants Castillo, Ricks, Lord, and Lerable, DENIED as to the *Monell* claim against the County, and DENIED as to punitive damages.

(2)    The City Defendants' motion for summary judgment is:

    (a)    GRANTED as to Claims 1, 2, 6, and 7; and

    (b)    DENIED as to Claims 3, 4, and 5 with respect to individual City Defendants Gonzalez, Ziebell, and Cornelison, DENIED as to the *Monell* claim against the City, and DENIED as to punitive damages.

(3)    This order terminates ECF 115 and 116.

Dated:  March 26, 2021

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

34